All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Please be seated. We are excited to hold argument today here at Duke's Law School. Thank you so much for hosting us. We're excited to be here. Our first case for argument is 23-1300, Incyte Corporation v. Sun Pharmaceuticals. Counsel, please proceed. Thank you, Your Honor. This is the court Mark Feldstein on behalf of Incyte. There are two main issues to address. The first is standing. We establish that Incyte has concrete plans that have created substantial risk of future infringement. And then secondly, obviousness where we show that the board improperly required Incyte to select only one compound over other compounds in violation of the holding of Novartis and other similar cases. On standing, as I mentioned, Incyte has declaratory evidence establishing concrete plans to develop a product that... Counsel, what's the proper date to consider standing from? We have that standing as of the day the notice of appeal was filed in December 2022. Okay. And so what is your best evidence to support that as of that date? The Michaelson Declaration and the first and the supplemental lead declarations both established that prior to that date, Incyte had concrete plans, had invested money into the first stage of developing formulations and scaling up the drug product, had a plan for schedule to go on from there as part of a development process onto human clinical testing and ultimately to NDA filing and marketing. So I'm not unsympathetic to your argument, but your problem is our precedent seems to require more than that. At least in the pharma cases, just a mere expression of an intent to explore an area and perhaps go to clinical trials and perhaps spend money, I think we've said is still too speculative to show that you're actually going to produce a product that has a substantial risk of infringement. Why does just your business plans and your basic intent to produce, go down this path, show a substantial risk of producing something that actually infringes just as opposed to doing exploration in the area that might infringe? So this is not exploration area that might infringe. There's a development project for the specific product with the specific drug component that will be used in the population. Counsel, that was one of my concerns building off of what Judge Hughes just asked, is you allocated a relatively small amount of money in the pharma world. I won't say the number because I think it's confidential. Is that right? Okay. A relatively small amount of money, but what your evidence reflects is that money was exploratory for two components. I'm not going to say this right. Ruxolitinib, bleh. Say it perfect. I don't know if I can say it perfect. You're obviously married to a woman because you did that just right. Ruxolitinib, whatever, and then the deuterated version. But the first one is not covered by the patent. So your company allocated a small amount of money to exploratory research on a product that would use either of two things, one of which is not even related to the patent. So we don't know at all how much of your exploration or your development efforts or even how much of that small amount of money is actually related to advancing a product related to the patent. So it is related to advancing a product under the patent. That money was a one-year commitment for the formulation development. The formulation is common to both Ruxolitinib and the deuterated Ruxolitinib. So it all effectively supports the product with deuterated Ruxolitinib in it. Well, not necessarily. That's like me saying that this exercise I'm doing is great for skiing and it's also great for running track. That's like saying almost anything we do is going to be good because it's going to be helpful to some product. I think maybe I can explain. There's a common excipient formulation that's used for both. Are you trying to use the water bottles as a demonstrative? What's going on there? Or were you just thirsty but you changed your mind? That was my excipient. An excipient formulation suitable for using with either Ruxolitinib or deuterated Ruxolitinib. That was the very first early stage work. The formulation, while it can be used for either Ruxolitinib or deuterated Ruxolitinib, is supporting fully the deuterated Ruxolitinib work. Did you make this argument in your brief? Because that's one of the things when they raised this point about how this exploratory money actually goes to two things, only one of which is covered by the patent. I don't remember you responding to that. I think it's in the lead declaration or the supplemental lead declaration. No, in your brief. I didn't ask you if it's in the lead declaration. I asked you whether you raised this argument in your brief because I don't remember seeing it. I don't think we explained to answer the question that the court is asking now why the formulation development is applicable in both. But it's the facts that support the case. It's in the record. It's part of the declaratory evidence. Okay. How far along were you in clinical trials as of the applicable date, the timing of the notice of appeal? Clinical trials had not started.  And to the extent this is, or Judge Heath's earlier question is related to the form of development timeline and algenesis, I don't think that there is a holding from this court saying that early pharmaceutical development doesn't create a substantial risk for future infringement. The fact that there is a timeline to be had for pharmaceutical development, in fact, I think, amplifies the concern here, amplifies the injury because it doesn't turn on a dime. You have to invest large amounts of money to get a product ultimately to market. And injury from an interfering, potentially blocking patent makes it all the worse. What's your best case from us on why you have standing? I think GE is closest to the facts. GE was developing the product. It might or might not proceed. I assume you mean the second GE, not the first GE. I assume I mean the second GE. I only have one in mind. Well, the first GE, which you cited to my concurring opinion, is unfortunately not the law, which would help you a lot. But the second GE, we did find standing. But I think that the declaration there was much more specific about the fact that it intended to develop a product and sell it to its customers that would infringe. And the problem here is, and maybe it's because the pharmaceutical sphere is different and we have a different precedent on that, but I don't think your declaration rises to that level, does it? I respectfully, and it is GE versus Raytheon 2020 opinion that you wrote the majority opinion on that we're relying on here. Do you have a pharma case that supports what you want to do here? The facts, I think, are closest to GE versus Raytheon. I mean, isn't that the problem is that we've said in the pharma sphere that development of compounds and treatments and dosages is far less predictable and that you have to have more concrete evidence of standing that you'll have a substantial risk of infringement. Whether that's right or not, that's what we've said, and we have to follow it. And what we do here is we do have concrete evidence of record on why this product is different than starting from a scratch new molecule development. This is a molecule that's already been tested for alopecia areata, which is the indication we're using. It's for a topical formulation or topical work for treating alopecia areata has already been done. The company Insight has already gotten approval both for the parent molecule, ruxolitinib, orally and topically. There's approved jackified for oral, and then there's approved ruxolitinib topically. So this is not starting from a brand new clean blank slate. It's building on already felt work and decades of experience. So your essential argument is you invented the lead compound or whatever you want to call it. I can't say that word at all, and I'm not going to even try it. And you have it for both topical and for oral. I think it's the patent for topical. The patent here is neutral to the- Okay, but theirs is for a deuterated version. The patent's for a deuterated version, you're correct. Which is a relatively new technique, but also pretty well-known by now. A relatively new technique, pretty well-known, and you found all these- So your best argument is we invented this compound, the non-deuterated version of the compound, so we know how to actually create the compound. We've done it for both oral and topical, and it's a relatively simple transition to a deuterated one. And you have evidence showing you intended to produce that, and that should give you a standing. And building on that, yes, Your Honor, building on that, both ruxolitinib and deuterated ruxolitinib have been shown to be effective for alopecia areata. So it's not going in and testing it in a field where nothing's been done yet. Both the parent compound and deuterated ruxolitinib have been shown effective for alopecia areata. And it's just a matter of an optimized formulation at this point to get a topical right for where there's an unmet need. That's motivating the work from insight in this regard. So can I- I just want to make sure I understand where things stood in, let's say, October of 2022. Is it true that in October of 2022, you had way, way back, you had had some prior development in this space, but that it had been shelved in favor of pursuit of a different product at that time? So 2015, there was a topical study of ruxolitinib for alopecia areata. That was put on the shelf or put on the back burner while other indications for topical were developed and ultimately approved in, I think, 2020. Other indications topical ruxolitinib were approved. And then this was picked up and money was devoted to this. But when? When was it picked back up and money devoted to it? The evidence in the record, when does it show that something happened to initiate or reinitiate your interest in pursuing this? The financial commitment was November of 2022. And what is the date here that we're worried about?  So, I mean, they kind of, I think, argue in their brief that this is very shammy. You know, it looks kind of like a sham. It looks like they threw a little bit of money at development of multiple things, only one of which is covered by the patent, and they did it on the eve of the notice of appeal. And that, do we not take all that into account when we're trying to figure out whether there is standing here? So I think it's the objective question of whether there's declaratory evidence establishing that what we were doing at the time were concrete plans that created a substantial risk. This wasn't a sham setup. This is not Insight Pharmaceutical Company going to make rocket engines or offering to make rocket engines. This is the sandbox that Insight invented and developed, and it's just the next progression beyond where they already are. Can you look at appendix page 12061? And I understand that you've identified some of the information on this page as confidential, so I will talk about it at a high level. But let me know when you get to appendix page 12061. And this follows up on Chief Judge Moore's question about kind of that sum of money she was talking about. At least figure one, and I'm going to say the first red bar in figure one, seems to identify the amount specifically of the larger amount that would just be focused on the relevant drug here. Do you agree with that? I'm sorry, can you say that again? So I'm looking at figure one, and there are a couple of red bars. Do you see that in figure one? Yes, yes. I think the top red bar seems to provide the amount that is applicable here and separates it out from the other product that I know that you two were discussing. I'm trying to differentiate that pot of money is what I'm trying to do right now. The money that was allocated for fiscal year 2023 is the second row on the Gantt chart. It's the formulation, it's 2023 money for formulation development for the topical product. Okay, so you're saying of these two red bars, the applicable red bar is the second red bar? For the 2023 investment, correct. Can you tell me what the first red bar is? That was other work that started in the previous year in 2022 on the scale-up of developing the compound. And there's a chart in the first lead declaration that shows that scale-up of the molecule to be able to synthesize it. Do you want to save some time for rebuttal, counsel? Yeah, I'll save all the rest of my time for rebuttal. Thank you. Thank you. Good morning, Your Honor. May it please the court, William J. Persun. I think it makes sense to start with standing, although obviously one point of commonality between standing and the merits is the significance of the fact that this is a method patent for using a specific compound to treat a specific disorder in specific therapeutic amounts. And one of the things that my friend didn't get to in his discussion of standing is we haven't even gotten to whether if they develop a formulation and if they bring it to market and if they get it with approval, whether it would even infringe, even under those circumstances. And so I think that is one of the key things that separates this, even, Judge Hughes, from the scenario that you opined on in your concurrence in GE. In that case, GE wanted to make a design that its customers wanted, or it was going to have to spend money to design around the patent. And there's no indication that that's the case here. Can you help me? We've been talking a lot about specific facts. We're an appellate court, so we don't usually do fact-finding. Do you have any kind of help for us on how this is usually done in other circuits? Particularly, I imagine this comes up in the D.C. Circuit all the time. It does come up in the D.C. Circuit all the time. And what the circuit has said is that you follow the ordinary summary judgment framework. So there is a production burden on the party that has the burden. So here are the burdens on Insight. So they had to come forward not later than the opening brief with their evidence of standing. And then the critical date, of course, is when you invoke federal jurisdiction with the filing of the Notice of Appeal. And in most cases, I will say candidly in the D.C. Circuit, that either that allegation on its face is insufficient, so it doesn't have to be rebutted, or it is sufficient and the other side doesn't successfully controvert it. I haven't found a case in which essentially there's like a direct fact dispute that the appellate court has to referee. I don't think that's the case. Do you think if there was a fact dispute, we would resolve it in the way you do, for instance, a motion for judgment on the administrative record? I think that's basically right. And we're obviously not going to hold hearings and hear witnesses, I don't think. I mean, the other side is taking the position that essentially, you know, appellant always wins in that circumstance, right? That you don't resolve the fact dispute, you just believe the appellant. I mean, to be clear, here we don't think that even if you credit everything in the declarations that they would have standing. But I agree that it's a hard question. I mean, I'll tell you that the Ninth Circuit has an appellate commissioner that it uses for cases where it has to do something that looks more like fact finding. I appoint you.  Counselor, what is your best case? So opposing Counselor Nakia, they thought their most applicable case was the GE case. What is the case that you think is most applicable to the standing issues here? So I think that there are several pharma cases. I mean, I think that Moderna is one. And there are two Moderna cases, but Moderna is one. I think Argentum is helpful to us as well. And what those cases make clear is that you don't have to have, you know, actually gotten FDA approval. That's not our position. You don't even necessarily have to have submitted your application. Right. But as in Altair, for example, you know, it helps a lot if you're on the eve of submitting your application so that you've actually arrived at what your formulation will be. And it's possible to assess the relevant question. And the relevant question is, is there a substantial likelihood that you'll face the product that you're seeking to market will face an accusation of infringement? And this is one area in which pharmaceuticals are different, not just because of the uncertainty of the development process, but also because of the safe harbor. I mean, in a non-pharma case, making the product for testing is still making the patented product. But that's not the case in the pharmaceutical space. And that's why this court's cases have always focused on what will be marketed, and that means what will be approved by the FDA. I mean, doesn't the fact that there's all this unpredictability in the pharma kind of cut both ways? Because if you're starting out at the very beginning, and you know there's a patent out there that is in the general area, and it's something you might run into, I would think you would have an interest in trying to invalidate it at the PTAB, even if you didn't know for sure your research and your expenditure money were going to lead to infringement. Well, so the thing about the PTAB, right, is that even people who don't have an interest in the pharmaceutical space… I mean, maybe that's part of the problem, is that Congress should have put a standing requirement at the PTAB, and then they wouldn't have shoved this mess to us. But they didn't, so we're here. But, you know, if you're – I mean, you have pharmaceutical cases all the time. They're really expensive to develop drugs, and why would you go down the path of even just starting out and spending all that money if there was a potential that the results you came up with would violate a patent? Well, I think that happens all the time, respectfully, Judge Hughes. I mean, that's why there is Hatch-Waxman. That is why drug development continued before there was a PTAB, that there is some uncertainty, and people do spend money assessing… I guess, but the fact that you can go through Hatch-Waxman and try to get it invalidated if you do a generic or something, it isn't really, to me, very relevant to the core question here, which is, are we really complying with the basic requirements of Article III in standing in this pharmaceutical space, or have we imposed a heightened burden that's inconsistent with standing law in general? No, I don't – it definitely is not a heightened burden because it just reflects what is infringing conduct in this space. And the other variable that's relevant to that is, what does the relevant patent claim? And now, if the patent is on a compound, it may well be easier to say, we are set on developing this compound, and we will infringe no matter what formulation we bring it to market in. So if, hypothetically, your patent was just on the deuterated compound here, then do you think they would have standing? If their patent was on the deuterated compound, I think they'd be a lot closer. I mean, they obviously – we would still make the same points about what was happening in December of 2022 and whether they were investing in actually bringing the deuterated compound to market. So does your argument kind of depend on the fact that the actual patent here is a fairly narrow patent on a specific method and specific dosages of a specific deuterated compound? I mean, that's – there's a reason why that's – that is why I began there, because I think – I won't say it depends on it, because I think the answer to Judge Cunningham's questions about December 2022 still turn on, you know, what were their plans then. But even spotting them all of that, the fact that this is a method patent not just to make the compound, but to actually treat a particular disorder and to do it with a particular dosing regime, that I think they can't get over. And they didn't try to get over it in the first declarations. Their attempt to get over it in the second lead declaration, it's entirely phrased in the passive voice that the product will be administered, but that is not the same thing as establishing that they are going to label their product to counsel patients or doctors to infringe. And so they just haven't established that they face a substantial likelihood of being accused of infringement, even with where they are today. I want to ask you a little bit of an off-the-wall question, because we're in front of students, and also it just occurred to me, since we're talking about how narrow this is, would it make any difference if they said, well, we don't know if we're going to come up with this same exact dosing regime, but if we come anywhere close, the patentee is going to argue it infringes under the doctrine of equivalence. Would that give them, if they'd said that in their declaration, additional support or standing? Well, I don't think that it even necessarily turns on what they recite in their declaration, because ultimately the question is, is there a substantial likelihood? And they absolutely don't have to establish that they would infringe. And so the doctrine, I think, takes account of some uncertainty about who might win a contested argument about what the patent covers or what is covered through the doctrine of equivalence. So if your patent said our dosing regime is, you know, whatever, 10 milligrams, and they say we can design around this and do it at 15 milligrams, that still might be enough to get standing, because you could potentially argue that there's still a substantial risk of infringement under that dosing regime. Right. If they had an oral product, and so they were doing the same function, and they were able to come in and show why they risked being accused of doing the same function in the same way with the same result, then they'd have a stronger case. But, of course, here they have this topical formulation, and they're trying in their declarations to convert percentages of weight into milligrams of product. And what they don't say, even after we've pointed this out, is that anything in their labeling would turn on administering a particular dosage, in other words, like a particular number of milligrams of deuterated ruxolithin per day. And without that, you don't infringe the claims. You don't come anywhere near the claims. And I don't think you could just say, you know, patentees are aggressive, and they assert the doctrine of equivalence all the time. I don't think that would be enough for standing, if that answers your question. Is your patent claim to only topical or only oral, or does it cover both? Claim one doesn't specify. So it could be either. It could, but it does have to be. The dosing regime is in the claims as well, so it has to be either 16 or 24 per day. So I'm not saying that it's impossible. How do you administer 16 milligrams a day topically? That's exactly the question that is not answered in the standing declarations. Like, they don't have a theory of that. I think what they've tried to do in the reply is that they have a little graph, and they say, essentially, someone somewhere, some patient somewhere, will at some point be at 16 milligrams on the y-axis, and so we'll look down to where on the x-axis that is. Like, if you put enough cream on, at some point, somebody will absorb exactly 16 milligrams worth or something like that, or the equivalent thereof. It will put into your body whatever the measurable, I don't know, results of 16 milligrams are. I take that to be their standing theory at page 12069 of the second declaration. That's the second declaration. Yeah, the will be administered. I mean, so do you believe that this creates an independent reason for no standing, or do you believe that I have to also agree with your characterization of the small amount of money allocated to the development of products related to both the deuterated version and the non-deuterated version as a sham? Do I have to kind of – because that's me having to buy into fact-finding in your favor about their intent. I mean, it doesn't look good, the eve of the notice of appeal, but you're making me do an awful lot of work to get there that route. So each of our standing arguments is independent of each other. So, in other words, if you agree with me about the dosing regimen, then that's all you need to decide. And I would say we have three pieces. One is what were they actually doing in December 2022. The second is just the sheer uncertainty that persists even today and even as of their letter this week about what their formulation will wind up being. And then the third point is about the dosing regimen and the uncertainty on any one of those three would be enough to defeat standing, in this case, given the nature of the claims of this patent. I mean, are you aware of any other area of the law on standing where a court's required to delve into the minutiae of – I mean, it's almost like we're turning this into a mini-infringement trial on appeal and arguing about dosage and all this kind of stuff. And it seems to me that this is far removed from the inquiry most courts undertake when they're looking just at Article III standing. I don't agree that it's different, but let me explain how. But let me just underscore one more time that we think that the question is not would they infringe. They could establish standing by showing a substantial likelihood that they will be accused of infringement. But the reason why I don't think this is different from the way standing works in other appellate settings where what's happening is someone is challenging a government action. The question is always is that government action harming the petitioner or appellant, and would canceling that government action or overturning it grant redress for that injury? And so in a patent case coming out of the PTAB, the government action involves the patent. So in other words, you have to be focused not on what is Sun's product, but what is Sun's patent, and how is Sun's patent harming insight such that if it were canceled, that injury would be redressed. And all of their assertions about competitive harm and so on, in this context, they can't just argue, and the other courts of appeals agree with this point, that what's bad for you is good for me and vice versa. And so therefore, I have standing to get the government to do bad things to you or take away good things that have been done in your benefit. The government action actually has to have a direct impact on the competition between the parties. And so Sun doesn't need a patent in order to market a competing product. And that's why the competitive injury is divorced from the patent. That is just basic Article III injury, in fact, redressability and traceability. I don't think it's different from how the other courts of appeals deal with this at all. And counsel, just so we level set on this, my understanding is we also already have ruled that they can't rely on the supplemental declaration in terms of standing on appeal. Is that my understanding accurate? So there were three lead declarations. The third one is out. I think the second one we objected to as well. The motions judge allowed it to be included in the appendix, but I think has sort of deferred to this panel on whether it's even proper in reply. And so we stand on our objection to that, that the physionics and other cases say that it's your burden to allege standing with your open brief. Unless the court has any further questions. Thank you, Mr. J. Thank you. I'm going to clarify this isn't a case where the product is unknown and there's uncertainty about how it overlaps with the patent. The product is clear what the molecule is. There are basically three limitations to the claim. There's the molecule that's clear in the product. There's the indication that's clear in the product. There's the dose. So what is your response about the fact that it's fundamentally a method claim? Because that was one of the things that opposing counsel point out in terms of inducement, Your Honor. I mean, you just told me that you're going to talk about the product, but I want to turn to maybe claim one, maybe put it in context of what's actually in the patent itself. And tell me why you would have standing in light of what's shown in the little plain language of claim. Sure. So the product is a product intended for use for treating alopecia areata. The method is simply using a product to treat alopecia areata at a dose. There's no more to it than that. It's not it's not a particularly narrow claim. It doesn't limit it to be whether it's like oral or topical or injectable. There's absolutely no limit on the delivery method. So it's not a narrow claim. It has only requirements of the drug, the indication, and the dose. So what is your response, though, to opposing counsel's argument that even as of today, the dosing is still somewhat unknown? So what is what the record establishes, particularly the supplemental lead declaration, is that in the intended patient population. He pointed out, I just want to be specific. He pointed out that there are multiple lead declarations. When you say supplemental lead declaration, can you be specific in terms of the date of that declaration? One, two, or three. Sure. It's titled supplemental lead declaration. It's appendix page 12067, where I'm referring right now. And in there, Dr. Lee explains how the formulations that are in development, each one of them used in the intended patient population for the expected use that they'll have. The area that alopecia patients have and need treatment, that those patients will use them. Some of them will use them at the claimed dose. I don't think there's a dispute factually on whether that will happen. The dispute ultimately then comes down to is will there be a reducement. But that still seems to put us in a substantial risk. Just using the framework that Chief Judge Moore set out, is that declaration one, two, or three? It's declaration two. And why should we allow that? I mean, they objected to it, and we have to rule on that as part of this decision. And it wasn't part of your initial filing. It wasn't in existence at the time of your filing. Why should we nonetheless accept it? So the first lead declaration did address that the doses will be used. And then there were arguments that were responded to from Sun. They had a surreply to those arguments. And Sun's arguments were that it was a sham, this wasn't going to hit the dose limits, that it wasn't a good faith project. And the supplemental lead declaration is in response to those arguments. Sun noted in the document statement that they were going to challenge standing. If they had filed a motion at the time, we would have known their arguments. We didn't know their arguments on what they were going to dispute until they disputed them in response to our opening brief. We replied to them. The court allowed them to have the surreply. It should all be considered. Okay. Thank both counsel. This case is taken under submission. Thank you, Your Honor.